**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARIA DOLORES ACEVES-SANTOS, | ) | |
| Alien No. 92-716-932 | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | Case No. |
| | ) | Petition for Writ of Habeas Corpus |
| | ) | |
| DANIEL J. SEDLOCK, JR., Chief of | ) | FILED: AUGUST 11, 2008 |
| Corrections, McHenry County Adult | ) | 08CV4550 |
| Corrections Facility; KEITH NYGREN, | ) | JUDGE DARRAH |
| Sheriff, McHenry County, Illinois; | ) | MAGISTRATE JUDGE COX |
| GLEN TRIVELINE, Field Office | ) | NF |
| Director of Detention and Removal | ) | |
| Operations, Chicago Field Office, | ) | |
| Immigration and Customs Enforcement, | ) | |
| | ) | |
| Respondents. | ) | |

**PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner, Maria Dolores Aceves-Santos (Ms. Aceves), through her attorneys at the Legal

Assistance Foundation of Metropolitan Chicago, hereby submits this petition, and alleges as follows:

**I.    PRELIMINARY STATEMENT**

1.    Ms. Aceves has been in Immigration and Customs Enforcement (ICE) custody for

nearly one year, with no end in sight to her detention, in spite of the fact that an Immigration Judge

(IJ) has granted her application for Withholding of Removal. She is entitled to a writ of habeas

corpus because this prolonged immigration custody without procedural safeguards violates her right

to Due Process and because no statute authorizes detention of a noncitizen beyond the "brief period

necessary for their removal proceedings." *Demore v. Kim*, 538 U.S. 510, 513 (2003).

2.    Ms. Aceves has lived in the United States since the age of 4, and is the parent of two

US Citizen children. She became a lawful permanent resident of the United States on December 12,

1989.

3.    Ms. Aceves is mentally ill and was abused as a child by her mother.  From 2000 until

2004 she was also abused by her boyfriend

4.    On several occasions Ms. Aceves has shoplifted or used another person's credit card

to obtain necessities for herself and her children.

5.    On July 12, 2007, ICE served Ms. Aceves with a Notice to Appear (NTA), alleging

that she was removable as a result of her convictions for check deception and theft.  On

approximately August 22, 2007, ICE took Ms. Aceves into custody, and she has been in custody

since.

6.    Ms. Aceves sought various forms of relief from removal, including relief under the

Convention Against Torture (CAT), Withholding of Removal, and a U Visa—a special visa for

crime victims.

7.    On January 16, 2008, the IJ ordered Ms. Aceves removed and denied her applications

for Withholding of Removal and CAT.  The Board of Immigration Appeals ("the Board") reversed

the IJ, and remanded Ms. Aceves's case for a new hearing on her application for CAT and

Withholding of Removal.

8.    On August 4, 2008, on remand, the IJ granted Ms. Aceves's application for

Withholding of Removal.  ICE reserved appeal and stated its position that Ms. Aceves is subject to

mandatory detention while it appeals.

9.    Ms. Aceves brings this habeas petition to challenge her detention upon two grounds.

First, Ms. Aceves seeks habeas relief because her almost year-long detention bears no reasonable

relationship to the Government's stated purpose for detaining her: to effect her removal.  Courts

have held that it may violate an immigrant's right to substantive due process to keep him or her in

detention where the Government has unreasonably delayed in adjudicating the case.  *See Hussain v.*

*Mukasey*, 510 F.3d 739, 743 (7th Cir. 2007); *Casas-Castrillon v. DHS*, No. 07-56261, 2008 WL 2902026, at *4 (9th Cir. July 25, 2008); *Tijani v. Willis*, 430 F.3d 1241, 1242 (9th Cir. 2005); *Ly v. Hansen*, 351 F.3d 263, 271 (6th Cir. 2003); *Fuller v. Gonzales*, No. Civ. A. 3:04CV2039SRU, 2005 WL 818614, *5 (D. Conn. April 8, 2005); *Diomande v. Wrona*, No. 05-73290, 2005 WL 3369498 (E.D. Mich. Dec. 12, 2005).

10.     The Government has unreasonably delayed in adjudicating Ms. Aceves's removal case.  After having been held for only 6 months in state criminal custody, Ms. Aceves was taken into ICE custody and placed in proceedings in August 2007.  She did not have her "merits" hearing until January 2008.  Another 5 months later, the Board remanded her case to the IJ.  After the case was remanded, ICE requested additional time to file a brief that it never filed.  Ms. Aceves finally had an evidentiary hearing in her case on July 2, 2008, but the IJ was forced to continue the case for more than another month for his decision, because the courtroom was not available until August 4, 2008.  Now, although Ms. Aceves has been granted Withholding of Removal relief, ICE plans to keep Ms. Aceves detained as it begins the lengthy appeals process.

11.     Ms. Aceves also seeks habeas relief because no statute authorizes detention of a noncitizen beyond the "brief period necessary for their removal proceedings."  *Demore v. Kim*, 538 U.S. 510, 513 (2003).  In the absence of clear language to the contrary, the rule of constitutional avoidance dictates that the statute be construed not to authorize mandatory detention beyond the brief period contemplated by the Supreme Court in *Demore*.  Ms. Aceves's almost year-long immigration detention does not fit into this "brief period," for which six months is above average. *See Demore v. Kim*, 538 U.S. at 531.

## II.    <u>JURISDICTION AND VENUE</u>

12.     This court has original jurisdiction to hear civil actions arising under the Constitution of the United States.  28 U.S.C. § 1331.

13.     This court has jurisdiction under 28 U.S.C. § 2241(c)(1) and (3) and the Suspension Clause of the United States Constitution, Art. I § 9, cl. 2, as presently the Petitioner is in ICE custody under color of the authority of the United States, and such custody is in violation of the Constitution of the United States.

14.     28 U.S.C. § 1252(g) does not preclude habeas jurisdiction in this case because the relief sought concerns custody and bond, not a discretionary decision of the Attorney General. *Matter of Vallas*, 21 I. & N. Dec. 769 (BIA 1996).

15.     This court may grant relief pursuant to 28 U.S.C. § 1651 (All Writs Act).

16.     Venue is proper in this district because Petitioner is presently detained at the McHenry County Detention Center in Woodstock, Illinois, located within the Northern District of Illinois. *See* 28 U.S.C. § 1391(e), 2241(d).

## III.   PARTIES

17.     Petitioner Maria Aceves is an immigrant from Mexico who has resided in the United States since she was four years old and has been a Lawful Permanent Resident since December 1989. She is the parent of two United States citizen children. She is currently subject to removal proceedings in the Chicago Immigration Court under file number A92-716-932. She has applied for a U Visa and has been granted Withholding of Removal.

18.     Respondent Daniel J. Sedlock Jr. is the Chief of Corrections of the McHenry County Detention Center in Woodstock, Illinois. In his official capacity, he is the immediate physical custodian of Ms. Aceves.

19.     Respondent Keith Nygren is the Sheriff of McHenry County, Illinois, and has ultimate responsibility for detainees held at the McHenry County Detention Center. In his official capacity, he is an immediate physical custodian of Ms. Aceves.

20.     Respondent Glen Triveline is the Chicago Field Office Director for Detention and

Removal Operations for ICE.  Mr. Triveline oversees the detention of aliens within his jurisdiction, and has authority to move aliens from facility to facility. The Chicago ICE office has entered into a contract with the McHenry County Detention Center such that the McHenry County facility acts as its agent.

## IV.    APPLICABLE STATUTES AND REGULATIONS

### A.  Detention

21.    The Immigration and Nationality Act (INA) contains two provisions governing the detention of immigrants in removal proceedings.  8 U.S.C. § 1226(c) mandates that the Attorney General arrest and detain an alien who has been convicted of certain offenses pending removal proceedings.  Alternatively, 8 U.S.C. § 1226(a) authorizes the Attorney General to release aliens not subject to mandatory detention under 8 U.S.C. § 1226(c) on bond.  DHS is responsible for making initial custody determinations regarding aliens in removal proceedings.  8 C.F.R. § 236.1(c)(8).  Immigration Judges (IJs) have the authority to review DHS's initial determination upon an oral or written request made by the alien.  8 C.F.R. § 1003.19.

22.    The INA contains one provision governing the detention of immigrants who have been ordered removed.  8 U.S.C. § 1231 provides that the Attorney General should generally detain an alien during a ninety day "removal period" while he attempts to effectuate the alien's removal to a designated country.  The statute sets out the procedure for designating a country of removal, and prohibits the Attorney General from removing an alien to certain countries where his or her life or freedom would be threatened.

### B.  Withholding of Removal

23.    Withholding of Removal is defined by 8 U.S.C. § 1231(b)(3), which states that the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of his or her race, religion,

nationality, membership in a particular social group, or political opinion. An IJ decides an application for Withholding of Removal.

### C. Convention Against Torture

24.    Under international law, a person may not be returned to a country where he or she will be tortured.[1] CAT was enacted into U.S. law on October 21, 1998.[2]  The Department of Justice has promulgated regulations implementing CAT. *See* 8 C.F.R. § 208.416-18. An IJ decides an application for CAT.

### D. The U Visa

25.    The U visa is defined by 8 U.S.C. § 1101(a)(15)(U). The four requirements for obtaining the U visa are as follows: (I) that the alien has suffered substantial physical or mental abuse as a result of having been a victim of criminal activity, (II) that the alien possesses information concerning the criminal activity, (III) that the alien has been helpful to law enforcement authorities in investigating and prosecuting the criminal activity, and (IV) that the criminal activity violated the laws of the United States or occurred in the United States. An IJ cannot adjudicate an application for a U Visa; the visa is currently adjudicated by the Vermont Service Center of USCIS.

## V.    STATEMENT OF FACTS

26.    Ms. Aceves first came to the United States with her mother from Mexico when she was four years old. She has been a lawful permanent resident of the United States since December 12, 1989.

---

[1] *See* United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), opened for signature Feb. 4, 1985, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51 at 197, U.N. Doc. A/Res/39/708 (1984), *reprinted in* 23 I.L.M. 1027 (1984), *modified in* 24 I.L.M. 535 (1985).

[2] *See* 1999 Omnibus Consolidated and Emergency Supplemental Appropriations Act, P.L. 105-277, Division G, Subdivision B, Title XXI § 2242 of the Foreign Affairs Reform and Restructuring Act of 1998, 112 Stat. 2681-822, 105th Cong. 2d Sess. (1998) [FARRA]; 144 Cong. Rec. H11044-03; 136 Cong. Rec. S17486, 36198 (1990); *Committee on Foreign Relations, Convention Against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment,* S. Exec. Rep. 101-30 (1990).

27.    Ms. Aceves was physically and emotionally abused from a young age: her mother beat her with hangers and threw objects at her.  When she was eight years old, she was sexually molested by a friend of her stepfather.  When Ms. Aceves reported this abuse to her mother, her mother did not believe her.  Ms. Aceves ran away and spent most of her teenage years homeless.

28.    Ms. Aceves has sometimes experienced visual and auditory hallucinations.  When she was sixteen, she attempted to commit suicide.

29.    Ms. Aceves gave birth to two U.S. citizen daughters—Erika (11) and Bekah (7).  She also had a son, Jorge, who has been informally adopted by a family in California.

30.    In September 2000, Ms. Aceves met Adrian Morales, a man from Cuernavaca, Mexico, who has no immigration status in the United States.  Mr. Morales and Ms. Aceves began dating, and eventually moved in together. They lived together for a total of four years, until 2004.

31.    Mr. Morales regularly beat Ms. Aceves.  Sometimes he beat her so badly that he knocked her unconscious.  He slapped her, kicked her in the face, beat her with pieces of wood, and threw objects at her.  When the neighbors would call the police, Mr. Morales would keep Ms. Aceves silent by threatening her with a box cutter.  At times, he forced her to have sex with him.  He frequently threatened that he would kill her, and hurt her mother, brother, and children.

32.    Mr. Morales also frightened Ms. Aceves with stories of the crimes that he committed while a member of the *Judicial*—the Mexican Federal Police.  For example, he told her that he and other *Judicial* members gang-raped a fifteen-year-old girl at a mall.  He told her that he "has killed before and will not hesitate to do it again."

33.    In early 2004, Ms. Aceves filed a police report stating that Mr. Morales had sexually abused her eight-year-old daughter, Erika Aceves.  Erika was later examined by a doctor at Wishard Pediatric Center in Indianapolis, who confirmed that her hymen was broken, and that she suffered from regular vaginal bleeding and vaginal scarring.

7

34.    Ms. Aceves cooperated fully with the police investigation of Mr. Morales.  When questioned by the police, Erika eventually identified Mr. Morales as her abuser.  The police requested that Mr. Morales appear for DNA testing, but he did not do so, and he remains at large today.

35.    On August 8, 2003, during her brutally abusive relationship with Mr. Morales, Ms. Aceves was convicted in the Superior Court of Tippecanoe County, Indiana, for theft.  She was sentenced to a six-month incarceration, and given a one-year suspended sentence.

36.    On July 18, 2005, Ms. Aceves was convicted of check deception, and given a one-year suspended sentence.  Ms. Aceves testified that she stole to obtain necessities like "groceries, baby clothes, and diapers."  In addition, she testified that on at least one occasion she wanted to get arrested to escape from Mr. Morales.

37.    In 2005, Ms. Aceves was diagnosed at the Wabash Valley Community Support Program as suffering from schizo-affective disorder, bipolar type.  After being diagnosed, she was prescribed a medication called Abilify.

38.    On July 12, 2007, while Ms. Aceves was in state custody, ICE served her with an NTA, alleging that she was removable for having been convicted of an aggravated felony.   On approximately August 22, 2007, ICE took her into custody.  After Ms. Aceves was arrested, Erika and Bekah stayed for four months with Ms. Aceves's friend, Belinda Bernard.  Thereafter, Ms. Aceves's mother, Adela, was awarded legal guardianship.

39.    Between August 22, 2007, and September 26, 2007, Ms. Aceves appeared for various "master calendar" hearings pro se.  A "master calendar" hearing is a kind of preliminary hearing in immigration court, as opposed to a full evidentiary hearing on the merits of the immigrant's case.

40.    On September 26, 2007, the Legal Assistance Foundation of Metropolitan Chicago entered its appearance on behalf of Ms. Aceves.

41.    Master calendar hearings were held before the IJ on October 15, 2007; October 29, 2007; November 14, 2007; and November 27, 2007.

42.    During this period of master calendar hearings, a pleading was taken on the charges, and Ms. Aceves filed an I-589 application for CAT and Withholding of Removal. These applications were based on her fear of persecution and torture at the hands of her ex-boyfriend's friends in the Mexican Federal police and on her fear that she will be forcibly institutionalized in Mexico in an unsafe mental health facility under conditions tantamount to torture.

43.    On November 1, 2007, Ms. Aceves also filed an application for a U visa with the USCIS Vermont Service Center. In support of her U visa application, she submitted extensive evidence of the police investigation of Mr. Morales, and her cooperation with the police, including eleven pages of police reports, a medical report, and a twenty-two page transcript of a police interview with Ms. Aceves. In connection with her U visa application, Ms. Aceves requested a waiver of her criminal convictions.[3] After sending four written requests to the USCIS Vermont Service Center to expedite adjudication of the U visa application, Ms. Aceves is still waiting to have her application adjudicated.

44.    On January 16, 2008, Ms. Aceves had her individual calendar hearing before the IJ, who denied her applications for Withholding of Removal and CAT relief and ordered her removal. He did not address Ms. Aceves's Withholding of Removal claim based on her membership in the social group of mentally disabled persons, or her CAT claim that she will be subjected to forced psychiatric commitment in Mexico under conditions amounting to torture.

45.    On January 28, 2008, Ms. Aceves filed a notice of appeal with the Board.

46.    On March 4, 2008, the Board issued the briefing schedule for her appeal, and on

---

[3] U visa applicants are eligible for a waiver of any ground of inadmissibility other than participation in Nazi persecution, genocide, or any act of extrajudicial killing. *See* 8 U.S.C. § 1182(d)(14). A U visa applicant is eligible to eventually adjust status to become a lawful permanent resident. *See* 8 U.S.C. § CITE.

March 25, 2008, Ms. Aceves filed her brief.

47.    On April 17, 2008, the Board remanded Ms. Aceves's case for the IJ to consider her Withholding of Removal and CAT claims related to her fear of persecution on account of her membership in the particular social group of mentally ill persons who require acute medical care.

48.    On April 25, 2008, a hearing was set for May 5, 2008, in the Immigration Court.

49.    Master calendar hearings were held before the IJ on May 5, 2008, and on May 14, 2008.  On May 14, the date for an individual hearing was set for June 4, 2008.

50.    On May 27, 2008, the date for an individual hearing was re-set to June 9, 2008.

51.    On May 30, 2008, Ms. Aceves filed additional documents in support of her claim in accordance with the local operating procedure that requires that all documents be filed by either party within ten days of an individual hearing.

52.    On June 9, 2008, the Government sought leave to file a response to the additional documents filed by Ms. Aceves in support of her claim.  The IJ granted the Government's request, and continued Ms. Aceves's individual hearing to July 2, 2008.

53.    In approximately early June 2008, a physician associated with McHenry prescribed Ms. Aceves an antidepressant named Remeron.  Remeron is not FDA-approved for bipolar individuals.

54.    After being prescribed Remeron, Ms. Aceves complained that it made her sleepy, and asked to have her dosage reduced.  Her dosage was not reduced.

55.    In approximately early June 2008, Ms. Aceves backwashed her Remeron tablet into her drinking cup.  McHenry placed Ms. Aceves in a disciplinary proceeding because of this incident. At her disciplinary hearing, Ms. Aceves stated that she backwashed her Remeron tablet because she had intended to break it in half and take only half the tablet.

56.    On June 11, 2008, McHenry placed Ms. Aceves in solitary confinement for five days

as a punishment for backwashing her Remeron tablet.

57.     At approximately the same time, the McHenry staff reduced Ms. Aceves's prescribed dosage of Remeron. McHenry has since taken Ms. Aceves off this medication entirely, and placed her on a different medication, Risperdal.

58.     On July 2, 2008, Ms. Aceves appeared in Immigration Court for her individual calendar hearing.  Because the Government had failed to file the brief it had requested special dispensation to file, the IJ barred the Government from making any additional legal argument, and continued the case until August 4, 2008, for a decision.  The Government attorney announced in open court that, if the Government loses, it will appeal.

59.     On August 4, 2008, upon ordering that Ms. Aceves be removed, the IJ granted her application for Withholding of Removal on the grounds that she would be persecuted in Mexico on account of her membership in the particular social group of "mentally ill persons who require acute medical care."  The IJ declined to reach Ms. Aceves's CAT claim.

60.     The Government reserved appeal and stated its position that Ms. Aceves will continue to be subject to mandatory custody while it appeals.

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM
### Respondents' Extraordinarily Lengthy Detention
### of Ms. Aceves Violates Her Right to Due Process Under the Fifth Amendment.

61.     Petitioner re-alleges paragraphs 1-60 of this Petition and incorporates them herein.

62.      Ms. Aceves has a liberty interest in not being detained for an indeterminate length of time. *Zadvydas v. Davis*, 533 U.S. 678, 696 (2001).

63.     Deprivation of a fundamental liberty interest can only be justified if the deprivation is narrowly tailored to serve a compelling governmental interest.  *Flores v. Reno*, 507 U.S. 292, 302 (1993).  Thus, immigration detention must bear a reasonable relationship to its purpose – to effect an

alien's removal.  *See Demore v. Kim*, 538 U.S. 510, 527 (2003); *Tijani v. Willis*, 430 F.3d 1241, 1249 (9th Cir. 2005) (Tashima, J., concurring).

64.    Ms. Aceves has now been held in immigration custody for nearly a year.  ICE's decision to appeal the IJ's grant of Withholding of Removal will prolong her detention indefinitely. The length of Ms. Aceves's detention has become "so egregious that it can no longer be said to be 'reasonably related' to an alien's removal."  *Demore v. Kim*, 538 U.S. 510, 532 (2003) (Kennedy, J., concurring).

65.    Ms. Aceves has suffered and continues to suffer prejudice as a result of respondents' actions in violation of the Due Process Clause.

## SECOND CLAIM
### No Statute Authorizes Ms. Aceves's Detention.

66.    Petitioner re-alleges paragraphs 1-60 of this Petition and incorporates them herein.

67.    The rule of constitutional avoidance, which the Supreme Court has consistently applied to immigration statutes, dictates reading a statute so as not to authorize unconstitutional action unless no other construction of the statute is even "fairly possible."  *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001); *see also Crowell v. Benson*, 285 U.S. 22, 62 (1932).

68.    Nothing in the text of any of the three principal statutory provisions that govern immigration custody authorizes prolonged detention without appropriate procedural safeguards.  *See* 8 U.S.C. §§ 1226, 1231.

69.    In the absence of clear language to the contrary, the rule of constitutional avoidance dictates that the applicable statute be construed not to authorize prolonged mandatory detention without procedural safeguards.

70.    Ms. Aceves has suffered and continues to suffer prejudice as a result of respondents' actions without statutory basis.  Therefore, habeas relief is appropriate in her case.

**VII.    RELIEF REQUESTED**

**PRAYER FOR RELIEF**

Wherefore, Petitioner Maria Dolores Aceves-Santos respectfully requests that this Court

grant the following relief:

(1)    Assume jurisdiction over this matter;

(2)    Grant Petitioner a writ of habeas corpus directing the Respondents to immediately

release the Petitioner from custody;

(3)    Grant such other and further relief this Court may deem appropriate.


Respectfully Submitted,

/s Geoffrey Heeren
Petitioner's Attorney


Geoffrey Heeren
Legal Assistance Foundation
 of Metropolitan Chicago
111 W. Jackson, 3rd floor
Chicago, Illinois  60604
(312) 347-8398

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| MARIA DOLORES ACEVES-SANTOS,<br>Alien No. 92-716-932 | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | Petition for Writ of Habeas Corpus |
| DANIEL J. SEDLOCK, JR., Chief of | ) | |
| Corrections, McHenry County Adult | ) | 08CV4550 |
| Corrections Facility; KEITH NYGREN, | ) | JUDGE DARRAH |
| Sheriff, McHenry County, Illinois, GLEN | ) | MAGISTRATE JUDGE COX |
| TRIVELINE, Field Office Director | ) | NF |
| of Detention and Removal Operations, | ) | |
| Chicago Field Office, Immigration and | ) | |
| Customs Enforcement, | ) | |
| | ) | |
| Respondents. | ) | |

**EXHIBITS TO THE PETITION FOR WRIT OF HABEAS CORPUS**

**TABLE OF CONTENTS**

Exhibit A: Verification of Petitioner Ms. Aceves............................................................................. 1

Exhibit B: Withholding of Removal Decision of Immigration Judge Gabriel C. Videla..................... 3

# EXHIBIT A

## VERIFICATION

I, Maria Dolores Aceves-Santos, detained at the McHenry County Jail in Woodstock, Illinois, verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have reviewed the foregoing Petition and Complaint, and that to the best of my knowledge, information, and belief, the facts alleged therein are true and correct.

Executed on: 8 - 6 - 08
               Date

Maria Dolores Aceves-Santos

# EXHIBIT B

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
CHICAGO, ILLINOIS

In the Matter of                        :
                                        :
ACEVES-SANTOS, Maria Dolores            :        IN REMOVAL
A# 92-716-932                           :        PROCEEDINGS
                                        :
        Respondent                      :
                                        :

CHARGE:         INA § 237(a)(2)(A)(iii)    Aggravated Felony

APPLICATIONS:                              Withholding of Removal, Convention
                                           Against Torture

ON BEHALF OF THE RESPONDENT                ON BEHALF OF THE DEPARTMENT
Geoffrey Heeren, Esq.                      Brendan Curran, Esq.
Legal Assistance Foundation of             Assistant Chief Counsel
Metropolitan Chicago                       Department of Homeland Security
111 W. Jackson Blvd., Ste 300              55 E. Monroe St., Ste. 1700
Chicago, IL 60604                          Chicago, IL 60603

## DECISION AND ORDER OF THE IMMIGRATION JUDGE

### I.    PROCEDURAL HISTORY

Maria Dolores Aceves-Santos ("Respondent") is a native and citizen of Mexico and a lawful permanent resident of the United States.  On July 12, 2007, she was served with a Notice to Appear ("NTA"), charging her with removability, pursuant to section 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA" or "the Act"), as an alien convicted of an aggravated felony defined by INA section 101(a)(43)(R). [Ex. 1.] On October 15, 2007, the Respondent, who is detained, appeared before the Immigration Court in Chicago via televideo.  Through counsel, she conceded proper service of the NTA and admitted five of the six factual allegations contained therein.  However, she denied the allegation relating to an Indiana state forgery conviction.  On this basis the Respondent also denied the charge of removability.

On October 29, 2007, the government served the Respondent with a Form I-261, charging the Respondent with removability as an alien convicted of an aggravated felony, defined by INA section 101(a)(43)(G) as a theft offense for which the term of imprisonment is at least one year. [Ex. 6.] The same day, the Respondent conceded proper service of the Form I-261. On November 14, 2007, the Respondent admitted the factual allegations contained in the Form I-261 and conceded the charge of removability.  The original charge found in the NTA was

1

withdrawn. Based on the Respondent's concessions and admissions, the Court finds that the government has established removability by clear and convincing evidence.

On January 18, 2007, the Respondent first appeared before this Court via televideo. When she declined to designate a country of removal, the government designated Mexico. INA § 241(b)(2)(D). After taking testimony from the Respondent pertaining to her eligibility for withholding of removal and relief under the Convention Against Torture ("CAT"), the Court denied her applications for relief and ordered her removed to Mexico. Matter of Aceves-Santos, No. A92 716 932 (Immig. Ct. NYC Jan. 18, 2008) ("Oral Decision").

On April 17, 2008, the Board of Immigration Appeals ("BIA") remanded for consideration of two theories of relief left unaddressed by the Court's oral decision. Matter of Aceves-Santos, No. A92 716 932 (BIA Apr. 17, 2008) ("BIA Decision"). First, the Court must determine whether the Respondent is eligible for withholding of removal due to her membership in a particular social group composed of mentally disabled individuals in need of acute psychiatric or psychological care. Second, the Court must determine whether the Respondent is eligible for relief under CAT as a result of her mental illness.

On July 2, 2008, the Court took testimony from the Respondent and her expert witness, Dr. Humberto L. Martinez. The Court allowed closing argument by the Respondent's counsel, but precluded the government because it failed to show good cause for missing the briefing deadline.

## II.    EXHIBITS

The following documents were admitted into evidence during the initial proceedings before the immigration court:

Ex. 1:     NTA, Served July 12, 2007

Ex. 2:     Documents Pertaining to the Respondent's Conviction for Forgery in Tippecanoe County, Indiana, Cause #79D02-0006-CF-063
- Plea Agreement, Dated Aug. 16, 2000
- Sentencing Order, Entered Sept. 12, 2000

Ex. 3:     Affidavit of Probable Cause Pertaining to the Respondent's Arrest in Cause #79D02-0006-CF-063, Signed June 22, 2000

Ex. 4:     Documents Pertaining to the Respondent's Conviction for Check Deception in Tippecanoe Country, Indiana, Cause #79DO5-0507-OM-01712
- Plea Agreement, Dated July 18, 2005
- Criminal Information, Dated June 30, 2005

Ex. 5:     Documents Pertaining to the Respondent's Conviction for Theft in Tippecanoe County, Indiana, Cause #79D05-0308-FD-355
- Plea Agreement, Dated Aug. 8, 2003

- Criminal Information, Dated Aug. 8, 2003

Ex. 6:    Form I-261, Additional Charges of Inadmissibilty, Deportability, Served Oct. 29, 2007

Ex. 7:    Form I-589, Application for Asylum and for Withholding of Removal, Filed Nov. 27, 2007

Ex. 8:    Letter to U.S. Dep't of State Requesting Comment on the Respondent's Application for Relief, Dated Nov. 27, 2007

Ex. 9:    Respondent's Country Condition Evidence
Tab C:        U.S. Dep't of State, <u>Mexico: Country Reports on Human Rights Practices – 2006</u> (Mar. 6, 2007)
Tab D:        Human Rights Watch, <u>Mexico: Probe Charges of Police Brutality in Oaxaca</u> (July 24, 2007)
Tab E:        Human Rights Watch, <u>Mexico: Impunity for Past Rights Abuses Continues</u> (Apr. 5, 2007)
Tab F:        Map of Mexico
Tab G:        Equality Now, <u>Mexico</u> (July 1999) (Submitted to the United Nations Human Rights Committee)
Tab H:        Diane Wetendorf, <u>The Impact of Police-Perpetrated Domestic Violence</u> (2000) reprinted in <u>Domestic Violence by Police Officers</u> (Donald C. Sheehan ed., Behavioral Sciences Unit, FBI Academy 2000)
Tab I:        Family Violence Prevention Fund, <u>The Facts on the Military and Violence Against Women</u>

Ex. 10:    Respondent's Evidence Pertaining to her Personal Circumstances
Tab A:        Affidavit of the Respondent
Tab B:        Photographs of the Respondent's Injuries
Tab J:        Letter from Samuel J Gruber, LCSW, Wabash Valley Hospital (Jan. 3, 2008)
Tab K:        Wabash Valley Hospital, <u>Case Conceptualization</u> (Nov. 29, 2006)
Tab L:        Mayo Clinic, <u>Schizoaffective Disorder</u> (Dec. 22, 2006)
Tab M:        Letter from Belinda Bernard, Homecare Coordinator, Hanna Community Center (Jan. 4, 2008)
Tab N:        Physician's Consultation Pertaining to Erika Alcala, the Respondent's Daughter
Tab O:        Letter from Ashleigh Johnson, B.S., Home Based Care Manager, Wabash Valley Hospital (Oct. 12, 2007)
Tab P:        Respondent's Estimate of the Cost of Obtaining Medication in Mexico

Ex. 11:    The University of Chicago Spanish Dictionary 220 (4th Ed. 1987)

3

Ex. 12:      Respondent's U Visa Application and Supporting Documentation

The following documents were admitted following the Board's remand to this Court:

Grp. Ex. A:   Respondent's Supplemental Documents, Filed May 30, 2008
           Tab A:      Respondent's Supplemental Brief
           Tab B:      Declaration and Curriculum Vitae of Dr. Humberto L. Martinez, the Respondent's Expert Witness
           Tab C:      Mental Disability Rights International, Human Rights & Mental Health: Mexico (Sept. 2000)
           Tab D:      Renee Alarcon, Mental Health and Mental Health Care in Latin America, 2 World Psych 54 (2003)
           Tab E:      U.S. Dep't of State, Mexico: Country Reports on Human Rights Practices – 2007 (Mar. 11, 2008)
           Tab F:      U.S. Dep't of State, Mexico: Country Reports on Human Rights Practices – 2004 (Feb. 28, 2005)
           Tab G:      Wabash Valley Hospital Records
- Targeted Population/Diagnosis Form
- Outpatient Fee Slip/Progress Note Form, Dated Apr. 17, 2007
- Outpatient Fee Slip/Progress Note Form, Signed June 26, 2007
- Outpatient Fee Slip/Progress Note Form, Signed Oct. 2, 2007
- Letter from Samuel Gruber, LCSW (Jan. 3 2008)

Ex. B:      Mental Disability Rights International, Human Rights & Mental Health Mexico (Sept. 2000) (complete copy)

## III.    TESTIMONY

### A.    Dr. Humberto L. Martinez

The government stipulated that Dr. Martinez is an expert in the field of psychiatry.

On July 2, 2008, Dr. Humberto Martinez was sworn in before the Court and testified to the following:

Dr. Martinez stated that he is familiar with the state of mental health care in Mexico, having visited the country with a human rights commission in 1999 and 2000. The visit was organized by an advocacy group called "Mental Disability Rights International," which arranged the trip by contacting Mexican activists working in the field. While in Mexico, Dr. Martinez visited several hospitals in and around Mexico City, as well as a hospital in Guadalajara, a city located in the state of Jalisco.

4

Dr. Martinez testified that the hospitals he visited offered extremely poor care. The facilities were often unhygienic, and he found urine and feces on the floor. He also noted that the beds often lacked mattresses and some patients were lying on the ground. He also stated that restraints were used without regard to the patient's personal safety. Patients also suffered from problems with their food and water, a lack of personnel to assist them, a lack of clinical records, and a lack of privacy. In 2000, Mental Disability Rights International published its findings in a report. See Mental Disability Rights International, Human Rights & Mental Health Mexico (Sept. 2000) [Ex. B.]

Dr. Martinez further testified that a mentally ill person in Mexico can be detained by the police. In addition, a doctor can order a patient detained if he is being treated in a general hospital. In either case, the doctor stated that the patient may be detained for life without any recourse. Dr. Martinez met people detained in this fashion when conducting interviews in the hospitals he visited.

As a member of the World Association for Psychosocial Rehabilitation and chair of the Association's human rights committee, Dr. Martinez indicated that he is familiar with the current state of the Mexican mental health system. The World Association has branches in more than sixty countries and holds a congress every three years. At the 2003 congress in New York, Dr. Martinez met with two members from Mexico. At the 2006 congress in Greece, the doctor also met with two members, Rosalba Bueno-Osawa and Maria Eugenia Ruiz Velasco. Ms. Bueno-Osawa and Ms. Ruiz informed him that while one hospital had been closed, thirty-two long term hospitals continue to operate. They also told Dr. Martinez that patients still lack community based alternatives to psychiatric hospitals.

Dr. Martinez testified that he became familiar with the Respondent's case by reviewing her medical records from Wabash Valley Hospital and by examining her affidavit. Based on these documents, the doctor stated that the Respondent had been diagnosed with the schizoaffective disorder, bipolar type. Assuming that the Respondent could not afford to pay for treatment in Mexico, Dr. Martinez stated that she was likely to be committed to a mental health institution. He predicted that the Respondent would have a psychotic break if she were to stop taking her medication. As a result, she would be arrested by the police or end up in a general hospital and, eventually, a psychiatric hospital.

Dr. Martinez stated that he is aware of the state of the mental health system in Guadalajara. Not only does he have pictures, but he also personally visited one of the hospitals in that city. On this basis, he stated that conditions in the Guadalajaran mental health system are poor. Wounds often go untreated, and patients are often confined to wheelchairs. He also stated that Abilify, the drug previously prescribed to the Respondent, is not available in Guadalajara. Consequently, the Respondent could only take older medications developed in the 1950s, which often have serious side effects. If committed to a facility of this kind, the doctor stated that the Respondent would not be permitted to leave for years.

On cross-examination by the government, Dr. Martinez testified that he had never seen the Respondent or spoken with her. While he admitted that every patient is a little different, he explained that he accepted the diagnosis of the doctors in Indiana because their reports described

the Respondent's symptomatology. Dr. Martinez explained that these records documented events that resulted in the Respondent obtaining treatment in 2005 and 2007. He believed that the Respondent was mainly treated on an outpatient basis, but thought that she had also received some inpatient care. He does not know whether the Respondent has ever received mental health treatment in Mexico. Also, he does not know whether the Respondent has ever been treated on an inpatient basis in Mexico. The doctor has never treated the Respondent.

According to Dr. Martinez, patients can be transferred to a psychiatric hospital by a doctor or taken there by the police without a civil commitment proceeding. A referral from a doctor is not needed when the police bring a patient to a psychiatric hospital.

On redirect, Dr. Martinez stated that the American Psychiatric Association publishes the Diagnostic and Statistical Manual of Mental Health Disorders, the "bible" for diagnosing psychiatric illnesses. This book contains the established categories of psychiatric conditions and lays out the particular symptoms associated with each condition. These descriptions are the standards for making diagnoses in particular cases. The doctor stated that the standard symptomatology for schizoaffective disorder includes a mix of elements from the two primary categories of psychological illnesses. It includes hallucinations and delusions, which are typical to schizophrenia, as well as depression and emotional difficulties, symptoms typical to psychological affective sicknesses. Dr. Martinez stated that the Respondent exhibited symptoms from both categories of psychiatric illnesses.

On the Court's inquiry, Dr. Martinez testified that he was familiar with a few kinds of hospitals in Mexico, but did not know whether non-psychiatric hospitals suffered from a lack of resources.

### B.    The Respondent

The government stipulated that on direct examination the Respondent would attest to the following:

In 2004, the Respondent was diagnosed with schizoaffective disorder, bipolar type with post traumatic stress disorder ("PTSD") at Wabash Valley Hospital. She was treated by Mary Jane Mungavan, MD, and Samuel Gruber, Licensed Certified Social Worker. She was prescribed Abilify, a medication that controls manias. Since June 23, 2008, the Respondent has taken Risperdal, a drug approved for the treatment of schizophrenia and bipolar disorder. The Respondent is originally from Guadalajara.

On July 2, 2008, the Respondent was sworn in before the Court on January 22, 2008, and testified to the following:

On inquiry by the government, the Respondent stated that she had received outpatient treatment from the Wabash Valley Hospital. Her medication was prescribed at the hospital. When she ran out of medication and could not afford to pay for more, the hospital provided it for free. The Respondent stated that she has never been civilly committed, been treated on an inpatient basis, or been involuntarily committed to a psychiatric institution. The Respondent

stated that she knows that she needs to take her medication, although she sometimes forgets. She relies on friends, family and her case manager to remind her.

## IV.    WITHHOLDING OF REMOVAL: INA § 241(b)(3)

### A. Legal Standards

An alien may not be removed to a country if the Attorney General determines that her life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group or political opinion. INA § 241(b)(3)(A). The alien bears the burden of establishing either past persecution or a future threat to the alien's life or freedom on account of a protected ground. 8 CFR § 208.16(b)(1),(2).   Withholding of removal is not a discretionary form of relief. Therefore, if the respondent establishes eligibility, withholding of removal must be granted. INA § 241(b)(3); see also INS v. Ventura, 537 U.S. 12, 13 (2002).

### 1.    Credibility & Corroboration

In all applications for withholding of removal, the Court must make a threshold determination of the alien's credibility. INA § 241(b)(3)(C); see also INA §§ 208(b)(1)(B)(ii), (iii). A respondent's credible testimony alone may be sufficient to sustain her burden of proof. 8 C.F.R. § 208.16(b). For applications filed on or after May 11, 2005, the following factors may be considered in the assessment of a respondent's credibility: demeanor, candor, responsiveness, inherent plausibility of the claim, the consistency between oral and written statements, the internal consistency of such statements, the consistency of such statements with evidence of record, and any inaccuracy or falsehood in such statements, whether or not such inaccuracy or falsehood goes to the heart of a respondent's claim. See INA §§ 208(b)(1)(B)(iii), 241(b)(3)(C) (stating that credibility assessments in withholding cases are governed by INA section 208(b)(1)(B)(ii) and (iii)); Sun v. BIA, 510 F.3d 377, 378 (2d Cir. 2007); Matter of J-Y-C-, 24 I. & N. Dec. 260 (BIA 2007). When the Court determines that an alien should provide evidence that corroborates otherwise credible testimony, she must provide such evidence unless she does not have it and cannot reasonably obtain it. See INA §§ 208(b)(1)(B)(ii), 241(b)(3)(C).

### 2.    Statutory Eligibility

A respondent may establish eligibility for withholding of removal in one of two ways: First she may show that she has suffered past persecution on account of her race, religion, nationality, membership in a particular social group or political opinion. 8 CFR § 208.16(b)(1). Second, she may show that her life or freedom would be threatened in the future on account of a protected ground. 8 CFR § 208.16(b)(2).

#### a.    *Past Persecution*

To establish past persecution, a respondent must demonstrate that she suffered persecution in the proposed country of removal on account of an actual or imputed protected ground. 8 C.F.R. § 1208.16(b)(1). If past persecution is established, a presumption arises that

7

the respondent's life or freedom would be threatened in the future in the country of removal on the basis of her original claim. Id. This regulatory presumption may be rebutted if the Department establishes by a preponderance of the evidence that there has been a fundamental change in circumstances or that the respondent could avoid future persecution by relocating to another part of the country and that it would be reasonable to expect her to do so. 8 C.F.R. § 1208.16(b)(1)(i), (ii). A respondent who fails to present a credible basis for a claim of past persecution may nevertheless prevail on a theory that her life or freedom would be threatened in the future, provided that the factual predicate underlying the theory is independent from the testimony found not to be credible. See Paul v. Gonzales, 444 F.3d 148, 154 (2d Cir. 2006).

### b.    Future Threat to Life or Freedom

To establish that her life or freedom would be threatened in the future, an alien must show that it is more likely than not she will suffer persecution on account of a protected ground in the proposed country of removal. INS v. Cardoza-Fonseca, 480 U.S. 421, 423 (1987); INA § 208(b)(2); 8 CFR § 1208.16(b)(2). In evaluating such a claim, the Court cannot require a respondent to prove that she will be singled out individually for persecution. Instead, a respondent may establish a "pattern and practice" of persecution against a group of persons "similarly situated" to the respondent on account of race, religion, nationality, membership in a particular social group or political opinion. 8 CFR § 208.16(b)(2)(i). A respondent must also show her own inclusion in the group such that it is more likely than not she will suffer persecution on return to the country of removal. Id. at § 208(b)(2)(ii). Generally, an applicant for withholding of removal who demonstrates a future threat to life or freedom, but not past persecution, must also show that she cannot avoid persecution by relocating to another part of the country. Id. at 208.16(b)(3)(i). Alternatively, the alien may demonstrate that it would be unreasonable to expect her to relocate. Id. at 208.16(b)(3)(i). However, when the persecutor is a government, or is government sponsored, it shall be presumed that relocation is unreasonable, unless the Department establishes by a preponderance of the evidence that, under the circumstances, it would be reasonable. Id. at 208.16(b)(3)(ii).

### c.    Persecution

There is no universally accepted definition of "persecution." See Handbook on Procedures and Criteria for Determining Refugee Status, Office of the United Nations High Commissioner for Refugees, ¶51, p.14 (Geneva, January 1992) ("Handbook"). "Persecution" has generally been interpreted to include threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom. Matter of Acosta, 19 I. & N. Dec. 211, 222 (BIA 1985) (noting that persecution may include mental suffering or even severe economic deprivation); Matter of T-Z-, 24 I. & N. Dec. 163, 173-75 (BIA 2007) (holding that nonphysical forms of harm, such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment, or other essentials of life, may amount to persecution). However, not all mistreatment amounts to persecution. Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir. 1993) (stating "the concept of persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional"). For instance, harassment and discrimination generally are not considered persecution within the meaning of the Act. Kambolli v. Gonzales, 449 F.3d 454, 457 (2d Cir. 2006) (finding that a respondent had

not suffered persecution because his only direct run-in with authorities consisted of a single threatening meeting with local police and he was not physically harmed).

The Board has stated that the definition of persecution requires proof that the persecutor intends to punish a respondent for possessing a characteristic a persecutor seeks to "overcome." Matter of Acosta, 19 I. & N. Dec. at 223. However, in Matter of Kasinga, the Board indicated that proof of punitive intent is unnecessary to demonstrate that mistreatment meets the definition of persecution. 21 I. & N. Dec. 357, 365 (BIA 1996). At least one circuit court has agreed that "punitive or malignant intent is not required for harm to constitute persecution." Id.; Pitcherskaia v. I.N.S., 118 F.3d 641, 646 (9th Cir. 1997) (holding that a respondent is not required to show that the government intended to punish her when it forced her to undergo therapy to change her sexual orientation).

###### d.    On Account Of

When applying for withholding of removal, a respondent must also demonstrate that the persecution she fears would be "on account of" her race, nationality, religion, membership in a particular social group or political opinion. 8 CFR § 208.16(b)(1),(2). While she need not show conclusively what the motive for the persecution would be, or that the persecutor would be motivated solely by a protected ground, the respondent must produce evidence from which it is reasonable to conclude that the harm would be motivated, at least in part, by an actual or imputed ground. INS v. Elias-Zacarias, 502 U.S. 478, 483 (1992); Matter of S-A-, 22 I. & N. Dec. 1328, 1336 (BIA 2000). In post-REAL ID asylum cases, the respondent must demonstrate that a protected ground—race, religion, nationality, membership in a particular social group, or political opinion—was or would be a "central reason" for the persecution. INA § 208(b)(1)(B)(i); see also Matter of J-B-N- & S-M-, 24 I. & N. Dec. 208 (BIA 2007). However, the statutory language pertaining to withholding claims does not explicitly impose this requirement. See INA § 241(b)(3)(C) (requiring the Court to apply the asylum standards found in INA section 208(b)(1)(B)(ii) and (iii), but not (i), which contains the "central reason" standard). But see Matter of J-B-N- & S-M-, 24 I. & N. Dec. 208 (BIA 2007) (upholding the denial of a post-REAL ID Act asylum and withholding case based on a failure to meet the central reason requirement). The Court notes that, even in the asylum context, the standard governing mixed motives cases "has not been radically altered by the [REAL ID] amendments." Id. at 214.

In a claim of persecution on account of membership in a particular social group, the respondent must establish that he or she possesses an immutable characteristic shared by a group of people—a characteristic that is either beyond the power of the individual members to change, or that is so fundamental to their identities or consciences that it should not be required to be changed. See Matter of Acosta, 19 I. & N. Dec. at 233-34; Lwin v. INS, 144 F.3d 505, 512 (7th Cir. 1998) (accepting the Acosta formulation of particular social groups). Once the respondent has demonstrated that they possess a common immutable characteristic, she need not demonstrate a "voluntary associational relationship" between members of the group. Lwin, 144 F.3d at 512; Hernandez-Montiel v. I.N.S., 225 F.3d 1084, 1093 (9th Cir. 2000) (stating that the "voluntary associational relationship" test is an alternative, independent means for establishing a particular social group). In addition, no showing of "cohesiveness" or "strict homogeneity among group members" is required. Matter of C-A-, 23 I. & N. Dec. 951, 956-57 (BIA 2006).

9

The Board of Immigration Appeals has held that "visibility is an important element in identifying the existence of a particular social group." Matter of C-A-, 23 I. & N. Dec. at 960 (finding that noncriminal informants who provided information to the Colombian government about the Cali drug cartel are not a visible enough group to constitute a particular social group for asylum purposes); Matter of A-M-E- and J-G-U-, 24 I. & N. Dec. 69, 75 (BIA 2007) (holding that the proposed social group of "affluent Guatemalans" lacked the requisite social visibility in part because there was no evidence that they "are exposed to more violence or human rights violations than other segments of society.").

In addition, social groups must be defined with a sufficient degree of definiteness and particularity. Id. at 74 (holding that "affluent Guatemalans" lacks the requisite degree of particularity).

### B. Legal Analysis

#### 1. Credibility

In its oral decision, the Court found that the Respondent did not testify credibly as to certain aspects of her application for relief based on the threat of harm posed by her ex-boyfriend, Adrian Morales. Oral Decision, 18 - 20. By contrast, the Court found the Respondent's testimony regarding her history of physical, emotional and sexual abuse to be credible. See id. at 17. Having had a second opportunity to listen to the Respondent and observe her demeanor, the Court finds that she has testified credibly with respect to her treatment for her psychiatric illness. Also, the Respondent corroborated her account with records documenting her recent medical history. See, e.g., Wabash Valley Hospital Records [Grp. Ex. A – Tab G.] Consequently, the Court is satisfied that the Respondent has testified credibly. She, therefore, has an independent basis for pursuing her claim. See Paul v. Gonzales, 444 F.3d at 154 (holding that an alien may pursue alternative theories of relief as long as the factual predicate of the additional claims are independent of incredible testimony).

The Court also found the testimony of the Respondent's expert witness, Dr. Humberto Martinez, to be reliable and truthful. The Court notes Dr. Martinez's expertise in psychiatry, his role in international organizations such as the World Association for Psychosocial Rehabilitation, and his familiarity with the state of the Mexican mental health system. See Curriculum Vitae of Dr. Humberto L. Martinez [Grp. Ex. A – Tab B.] As a result, the Court will give his testimony and affidavit significant weight.

#### 2. Statutory Eligibility

The Respondent asserts that her life or freedom will be threatened in Mexico due to her membership in a particular social group composed of mentally ill persons who require acute psychiatric or psychological care. The Seventh Circuit has developed a three part test for adjudicating claims made on the basis of membership in a particular social group. See Lwin v. INS, 144 F.3d at 510. The Respondent must (a) identify a particular social group; (b) establish that she is a member of that group; and (c) establish her eligibility based on membership in that group. See id.

a.    *Identifying a Cognizable Social Group*

The Court holds that mentally ill persons who require acute psychiatric or psychological treatment compose a cognizable social group.

First, mentally ill individuals who are in need of acute psychiatric or psychological care are united by a common immutable characteristic. See Matter of Acosta, 19 I. & N. Dec. at 233-34. Whether the roots of severe psychological illness are found in biology or past trauma, it is beyond the power of the individual to change without treatment.

Also, individuals in need of acute psychiatric treatment are socially visible. See Matter of C-A-, 23 I. & N. Dec. at 960. The record indicates that Mexican society distinguishes persons suffering from severe mental illness from the general public. See, e.g., U.S. Dep't of State, Mexico: Country Reports on Human Rights Practices – 2007 10 (Mar. 11, 2008) [Grp. Ex. A – Tab E] (stating that the government has passed anti-discrimination laws that remain partially unenforced). A person suffering from a disease requiring acute treatment is likely to engage in conduct that appears unusual to others. For instance, according to Dr. Martinez, the symptoms of schizophrenia include hallucinations and delusions, while the symptoms associated with an affective illness include depression and emotional difficulties. These kinds of symptoms are noticeable to the average person. The Court also notes that the government is required, under Mexican law, to distinguish people who suffer from severe mental illness from other members of society. According to a report published by Mental Disability Rights International, Mexican law requires the commitment of persons who "require urgent care" or who pose a danger to themselves or others due to a "severe mental disturbance." Mental Disability Rights International, Human Rights & Mental Health: Mexico 32 (Sept. 2000). Thus, under the law governing involuntary commitment, the government must view persons requiring acute treatment due to serious mental illness differently from other members of the public.

Finally, the Court finds that a particular social group composed of mentally disabled persons in need of acute psychiatric care is sufficiently definite and discrete. See Matter of A-M-E- and J-G-U-, 24 I. & N. Dec. 69 at 74. In determining whether a mentally disabled person requires "acute" care, the Court does not rely on "subjective, inchoate, and variable" criteria. Id. In the context of proving the severity of a mental disease, parties are able to present expert witnesses and other evidence drawn from accepted psychological treatises, such as the Diagnostic and Statistical Manual of Mental Health Disorders, mentioned by Dr. Martinez in his testimony. Other evidence directly describing a respondent's symptoms and conduct will also indicate to the Court the severity of her illness. Consequently, the social group definition proposed by the Respondent is not so vague that the Courts cannot distinguish the group's members from the general public.

The particular social group identified by the Respondent is also discrete. Because it is limited to persons requiring acute treatment, it does not encompass the large number of people who suffer from less disabling forms of mental illness. Cf. Raffington v. INS, 340 F.3d 720, 723 (8th Cir. 2003) (rejecting a particular social group composed of the mentally ill because it is "too large and diverse a group to qualify.").

b.    *Membership*

The Court is satisfied that the Respondent is mentally ill and requires acute psychiatric care. The record establishes that she suffers from schizoaffective disorder, bipolar type, a psychiatric illness that can cause hallucinations, disorganized thinking and paranoia. Mayo Clinic, Schizoaffective Disorder (Dec. 22, 2006) [Ex. 10 – Tab L.] Those suffering from this disease also experience depression and manic mood swings. Id. Other symptoms include delusions and thoughts of suicide. Id. The record also establishes that the Respondent requires, at a minimum, medication to control these symptoms. Consequently, the Court concludes that the Respondent belongs to a particularly social group composed of the mentally ill who require acute psychiatric or psychological care.

c.    *Eligibility*

i.    More Likely than Not

The Respondent has established that it is more likely than not she will be involuntarily committed to a public psychiatric hospital for an indefinite period of time if removed to Mexico.

The Court finds that it is more likely than not that the Respondent will suffer a "psychotic break" or similar event. The record indicates that the Respondent will not be able to afford to pay for her medication if removed to Mexico. Estimate of Cost [Ex. 10 – Tab P] (stating that the cost of the Respondent's medication exceeds $3,000 per year); Respondent's Application for Withholding of Removal 4 [Ex. 7] (stating that the Respondent has only had a high school education and worked as a fast-food cashier). Further, the Mexican mental health system is unlikely to provide the Respondent with her medications for free, unless she enters a public psychiatric hospital. Human Rights and Mental Health: Mexico 40 [Ex. B.] (stating that free psychotropic medication is generally only available to the poor when they are treated as inpatients, while case-by-case approval for out-patients is "difficult to obtain."). Id. In addition, the Respondent's illness is likely to be exacerbated by the absence of her family and friends. Letter from Samuel J Gruber [Ex. 10 – Tab J] (stating that the Respondent depends on her mother for assistance with performing routine tasks such as maintaining hygiene). According to her testimony, the Respondent also relies on her family and a friend to maintain her medication regimen. See also Targeted Population/Diagnosis Form [Grp. Ex. A – Tab G] (indicating that the Respondent has routinely missed doctor's appointments). Without this "support system," the Court believes that the Respondent will have increased difficulties coping with her illness.

Because the Respondent is likely to experience a psychotic break or other serious psychiatric episode, it is more likely than not she will be involuntarily committed to a Mexican psychiatric hospital for an indefinite period of time. As discussed above, people with schizoaffective disorder suffer from hallucinations, disorganized thinking, paranoia, depression, manic mood swings, delusions and suicidal thinking. Mayo Clinic, Schizoaffective Disorder [Ex. 10 – Tab L.] Without her medication, the Respondent has exhibited many of these symptoms, including "auditory and visual hallucinations," slowed and racing thoughts, paranoia and depression. Letter from Samuel J Gruber, LCSW, Wabash Valley Hospital (Jan. 3, 2008) [Ex. 10 – Tab J]; Outpatient Fee Slip/Progress Note Form, Dated Apr. 17, 2007 [Grp. Ex. A – Tab G.] Further, according to the Respondent, she has attempted to commit suicide on at least one

occasion. Aff. of the Respondent ¶ 7 [Grp. Ex. A – Tab A.] The Court credits this assertion. Consequently, the Respondent will come to the attention of medical authorities or the police who will be obligated to transfer her to a psychiatric institution. Once there, she will be detained for an indefinite period of time. Mental Disability Rights International, Human Rights & Mental Health: Mexico viii, ix [Ex. B] (stating that the majority of patients remain for more than a year, and are often committed for their lifetime; further stating that detention is at the sole discretion of the hospital authorities).

The Court also notes that even if the Respondent does not suffer from a psychotic break, she may still be involuntarily committed to a psychiatric hospital. Persons suffering from less disabling mental illnesses than the Respondent are often involuntarily committed to public psychiatric institutions in Mexico. Human Rights and Mental Health: Mexico x [Ex. B] (stating that a large number of people who are fully capable of living in the community are committed). These persons are committed despite doubts about whether they meet the standard for involuntary commitment. Id. By contrast, the testimony of Dr. Martinez and the documentary evidence indicates that the Respondent is likely to meet the standard. Thus, the probability of her involuntary commitment must be significant. However, even if her relapse is less severe, the fact that persons with milder illnesses are involuntarily committed indicates she still runs a significant risk of persecution.

For these reasons, the Respondent has demonstrated that it is more likely than not she will be subject to involuntary commitment in a Mexican public psychiatric hospital for an indefinite period of time.

ii.    Persecution

The Court holds that indefinite involuntary commitment to a psychiatric institution characterized by the inhumane conditions demonstrated by this record is persecution within the meaning of the Act. When determining whether detention is persecution, the Courts should consider the totality of the circumstances, including the length, frequency of the confinement, as well as the severity of treatment and the presence of abuse. Bejko v. Gonzales, 468 F.3d 482, 485 (7th Cir. 2006). Here, the record indicates that persons confined to Mexican public psychiatric hospitals are often detained indefinitely. Mental Disability Rights International, Human Rights & Mental Health: Mexico viii [Ex. B.]

Further, the conditions in Mexico's public psychiatric hospitals are extremely poor. The record indicates that patients have no privacy and no control over even the most "minute and personal decisions" of daily life. Id. at iv. The record also shows that hospital facilities are filthy, treatment practices are unhygienic and medical care is lacking. Id. Even basic items such as food, clothes and blankets are often unavailable. Id.; Declaration of Dr. Martinez, 2 [Grp. Ex. A – Tab B.] The condition of hospitals located in states far from Mexico City, such as the psychiatric hospital in the Respondent's home state of Jalisco, is much worse. Id. at v (stating that patients in these facilities urinate and defecate on the floor, are penned in small spaces, and are subject to the long term use of physical restraints).

The Court notes that the Mexican government's intent to cure or otherwise benefit the Respondent by involuntary confinement does not preclude her from establishing asylum eligibility. There is no requirement that the persecutor have a "punitive intent." Matter of Kasinga, 21 I. & N. Dec. at 365. "The fact that a persecutor believes the harm he is inflicting is good for his victim does not make it any less painful to the victim, or, indeed, remove the conduct from the statutory definition of persecution." Pitcherskaia, 118 F.3d at 648.

Under these circumstances, the Court holds that involuntary commitment to Mexico's public psychiatric hospitals constitutes persecution within the meaning of the Act.

iii.    Internal Relocation

The Respondent has shown that she will be persecuted by a government entity, the Mexican public mental health system. See Human Rights and Mental Health: Mexico 6 [Ex. B] (stating the public psychiatric hospital system was established by the Mexican Department for Mental Health). Consequently, the Court must presume that internal relocation is unreasonable. 8 CFR 208.16(b)(3)(ii). The government has provided no evidence to rebut this presumption. Thus, the Court finds that it is not reasonable to expect the Respondent to relocate to avoid persecution. Also, there is no evidence to indicate that the Respondent could avoid persecution by relocating.

For the foregoing reasons, the Court holds that the Respondent has established her eligibility for withholding of removal based on her membership in a particular social group composed of mentally ill persons who require acute medical care. Because eligibility has been established, the Court must grant relief. See INS v. Ventura, 537 U.S. at 13.

## V.    CONVENTION AGAINST TORTURE ("CAT")

Having granted withholding of removal under section 241(b)(3) of the INA, the Court declines to reach the Respondent's claim for withholding of removal under the Convention Against Torture.

Accordingly, after a careful review of the record, the Court will order the Respondent removed to Mexico, but grant her application for withholding of removal. Matter of I-S- & C-S-, 24 I. & N. Dec. 432 (BIA 2008) (requiring the IJ to first enter an order of removal before granting withholding of removal). In consequence, the following order will be entered:

### ORDER

IT IS HEREBY ORDERED that the Respondent be removed to **MEXICO.**

IT IS FURTHER ORDERED that the Respondent's application for withholding of removal to Mexico pursuant to section 241(b)(3) of the Act be GRANTED.

**August 4, 2008**

Gabriel C. Videla
Immigration Judge

14